IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| DARIUS GAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:12-cv-04066-SLD-JEH |
| | ) | |
| CITY OF EAST MOLINE, and | ) | |
| East Moline Police Officers | ) | |
| DOUG AVERILL and | ) | |
| JOHN SHOWALTER, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Plaintiff Darius Gay was injured on February 22, 2012, when Defendant East Moline Police

Officer Doug Averill and Lieutenant John Showalter ("the Officers") detained him on suspicion of

criminal activity. In an eight-count Complaint, Gay sued the officers under 42 U.S.C. § 1983 and

Illinois state law, claiming he was unlawfully arrested with excessive force, denied medical care, and

battered. Gay also brought claims against Defendant City of East Moline, alleging that the City is

vicariously liable for the officers' conduct and must indemnify them. Plaintiff has withdrawn Count

V, which accordingly is DISMISSED. Defendants have moved for summary judgment on all counts.

For the following reasons, the Court GRANTS Defendants' Motion for Summary Judgment, ECF

No. 26.

## BACKGROUND

Around 7:10 p.m. on February 22, 2012, East Moline police officers were dispatched to the

100 block of 17th Avenue, East Moline, to investigate a report of a suspicious person. Lt. Showalter,

an East Moline police officer since 1991, was the second shift commander that night and received the report, which described a suspicious person with a flashlight looking around the back of residences—"a basic prowler complaint," in his words.[1]  Showalter Dep. 44:8–17, ECF No. 26-2. The initial description was of a medium-build male wearing a neon white coat and hat, but when Lt. Showalter met with the complainant, he received a different description: the suspect wore a black and grey coat with reflective trim or stripes.  Showalter Dep. 46:6–21; Averill Aff. 3, ECF No. 16-1. The second description placed the suspect in the 300 block of 17th Avenue.  Showalter Dep. 49:23–25.  Before leaving to investigate the claim, Lt. Showalter radioed the information to Ofc. Averill, an East Moline police officer since 2001, who was on patrol that evening.  *Id.* 46:20–21. Ofc. Averill believed, based on the report of "someone prowling around in yards with a flashlight in the cold at night," that he was looking for "either some sort of Peeping Tom or a burglar."  Averill Dep. 33:20–24, ECF No. 27-2.

Ofc. Averill claims he first saw Gay in the 500 block, standing at the corner of 5th Street and 17th Avenue.  *Id.* 34:25–35:1.  Ofc. Averill believed he had found the suspect because Gay appeared to be wearing a hat and a dark-colored jacket with lighter-colored stripes on the sleeves.  *Id.* 35:15–24.  Ofc. Averill drove around the block and came up behind Gay, and noticed something reflective or neon in color "coming from the bottom of his coat."  *Id.* 37:13–14.  Because Ofc. Averill now deemed Gay to fully meet the suspect's description, he decided to conduct a "subject check."  *Id.* 37:18–22.

---

[1] Gay repeatedly argues that Defendant officers' deposition testimony regarding the suspicious-person report they received and the thought processes they underwent in linking Gay to that subject is inadmissible hearsay.  *See, e.g.*, Pl.'s Resp. to Mot. Summ. J. 3, ECF No. 27.  Such evidence is admissible, however, because it is not hearsay for the purposes of deciding this motion for summary judgment—the Court is only considering the officers' testimony on the relevant points to show their state of mind in investigating Gay, and not for the substantive truth of the prowler's activities or reports thereof.  *See* Fed. R. Evid. 801(c)(2).

According to Ofc. Averill, Gay had moved from the corner at this point, and was walking eastbound on 17th Avenue on the south sidewalk. *Id.* 40:18–19. As Ofc. Averill drove up, he claims Gay told him to go away, employing profanity. Ofc. Averill put the patrol car in park. *Id.* 41:5–22. Gay was standing in front of some steps leading up to a porch, which Ofc. Averill later learned was Gay's residence. *Id.* 41:23–42:5. Ofc. Averill claims he got out of the car and Gay "just began screaming" profanity at him. *Id.* 44:2–12. As he approached, Gay looked as if he would walk up the steps, but then turned to face Ofc. Averill. *Id.* 45:3–6. Ofc. Averill said that for a minute or two, he attempted to explain why he was stopping Gay, but Gay's profanity-laced tirade continued. *Id.* 46:12–47:9. Gay had his hands in his pockets, and Ofc. Averill said he requested that Gay show him his hands "to make sure [he was] not going to try to shoot me or stab me, or whatnot, just a purely officer safety thing." *Id.* 47:16–20. In addition to more profanity and a complaint about the cold, Ofc. Averill recalls Gay responding by showing him his hands "once or twice," fleetingly and one at a time, but generally keeping them in his pockets. *Id.* 48:1–9. Ofc. Averill repeatedly requested to see Gay's hands. *Id.* 48:22–23.

According to Gay, he was heading to his third-shift job and was waiting on the front porch of his apartment building to catch a bus at a stop on the corner of 5th Street and 17th Avenue, 10 to 12 feet from his building, when Ofc. Averill approached. Gay Dep. 16:9–20:6, ECF No. 27-3. Gay recalls wearing a black coat with blue rally stripes that night; they may or may not have been reflective. *Id.* 22:6–18. Gay wore a neon green vest at work, and typically either wore it to work or brought it along in his backpack; he cannot recall if he was wearing it. *Id.* 23:2–17. Having just been on a phone call and leaving his apartment, Gay had a cell phone in one hand and keys in another. *Id.* 26:17–25. Gay claims he saw Ofc. Averill give him a hand signal to stop, and heard

Ofc. Averill yell something at him, while still in the patrol car. *Id.* 20:12–14. Ofc. Averill got out of the car and immediately ordered Gay to show him his hands. *Id.* 27:7–9. Gay claims his hands were not in his pockets, and Ofc. Averill could clearly see them. *Id.* 27:11–19. Meanwhile, Gay says he told Ofc. Averill that he had not done anything wrong, and was just waiting to catch the bus. *Id.* 27:25–28:5. Gay claims he had not yet employed any profanity. *Id.* 29:1.

Gay's deposition testimony about showing his hands is inconsistent. Gay first testified that, upon Ofc. Averill's repeated demands to see his hands, Gay held out his hands, which he claims contained his cell phone and keys. *Id.* 29:1–30:25, 33:15–20. However, when pressed about the location of his hands, Gay admitted, "I can't recall, tell you the truth. I mean, I am not about to sit here and say, like, I can just magically tell you the whole thing of what happened." *Id.* 31:1–3. When further asked how he would characterize his reaction, Gay replied, "My indication is that he seen my hands clear as day, however my hands were. And there is no reason why he had to keep on saying, 'Show me your hands,' when he seen my hands." *Id.* 31:6–9. And, "I just don't recall specifically where my hands were." *Id.* 30:12–13.

According to Gay, Ofc. Averill slowly walked up to Gay while Gay was trying to explain that he was just waiting for a bus and lived nearby. *Id.* 29:2–22. Ofc. Averill reached Gay, who was on the bottom step leading up to his porch, and both men were "standing there right in front of each other." Gay claims he did not turn or move away. *Id.* 29:18–22. That's when, without further discussion, Ofc. Averill "grab[bed] him" by the shoulder and put him in an "arm drag," a type of wrestling move. *Id.* 31:18–32:4. Gay says he did not resist the move, but just "went straight down to the ground." *Id.* 32:19–20. He said he then felt a sharp pain in his left shoulder. *Id.* 32:24–33:3.

As Ofc. Averill approached Gay, Ofc. Averill said he heard a lot of radio traffic over his ear piece. Ofc. Averill said he normally would call for backup with a person as "agitated and irate" as Gay was. Averill Dep. 49:3–9. Gay's agitation appeared to be "escalating," he was refusing to show his hands, and he started climbing a few of the steps, which led Ofc. Averill to believe backup was needed. *Id.* 49:15–24. Worried that no one would hear him through the radio traffic, Ofc. Averill said he hit the radio's panic button, granting his signal priority on the channel, and called for backup. *Id.* 50:2–9. By that point, Ofc. Averill claims Gay had climbed to the third step and was turned away from Ofc. Averill. *Id.* 50:14–51:1. Ofc. Averill "determined to get physical control of" Gay because he thought flight was imminent, and grabbed the nearest part of Gay's body, his right hand and arm. *Id.* 51:3–8. Initially, Ofc. Averill claims, he just held Gay's arm and repeatedly commanded him to "get on the ground." *Id.* 51:11–14. Ofc. Averill claims Gay responded by swearing at him and refusing to obey. *Id.* 51:15–23. Ofc. Averill decided he would have to physically put Gay on the ground, but he claims Gay initially resisted the movement downward by shifting his body to counteract Ofc. Averill's effort. *Id.* 51:23–52:2. As a result, Ofc. Averill said, "I had to spin him and then force him onto the ground." *Id.* 52:6–10.

An external surveillance camera on a passing Metrolink bus captured a portion of the takedown on video. *See* Pl.'s Resp. to Mot. Summ. J., Ex. 4. The footage is low-resolution, blurry, and taken at a distance from the action. To the extent details are roughly discernible, however, it depicts two people standing in close proximity at the intersection of the sidewalk and the steps, when one reaches out to grab the other. The bodies shift back and forth, and one person brings the other to the ground and places himself on top. The takedown lasts only a few seconds. *See id.*

Once they landed, Ofc. Averill—six feet, four inches tall, weighing 270 pounds—said he immediately got on top of Gay, who is five feet, nine inches tall and weighs 175 pounds. Averill Dep. 54:4–25; Gay Dep. 13:19–20. Ofc. Averill said he then sought to handcuff Gay, and pulled Gay's right arm out from under his body despite Gay's alleged attempts to resist and pull his arm away. Ofc. Averill said he did not "deliver any type of blows" to Gay. Ofc. Averill Dep. 55:24–56:3. Due to Gay's positioning and the need to hold onto his right arm, Ofc. Averill could not grab Gay's left; so, he decided to maintain his position until Lt. Showalter, who had signaled he was en route, arrived. *Id.* 56:25–57:10.

According to Gay, once on top of him, Ofc. Averill demanded that he put his arms behind his back, but Gay replied that he could not move his left arm and his left shoulder was "messed up." Otherwise, Gay said, he provided no resistance. Gay Dep. 33:4–21. Gay claims he felt Ofc. Averill, who was "kind of like choking [Gay] out," also strike him repeatedly in the side of his head with his elbows. *Id.* 35:11–22. He said he and Ofc. Averill were swearing at one another at this point. *Id.* 37:11–23. Even though Gay could not see him arrive, Gay said he noticed when Lt. Showalter joined in the action: "I felt a kick in my side, and then I feel, like, four hands grabbing me. So I know it's two people on top of me now." *Id.* 33:9–11. Gay, who said he was partly on his knees under Ofc. Averill, was knocked fully flat by the kick in the ribs, which Gay claims could not have originated from Ofc. Averill because he was laying on top of Gay. *Id.* 34:18–21.

According to Lt. Showalter, he arrived at the scene in response to Ofc. Averill's call for backup, pulling up behind the Metrolink bus, around the side of which he could see a "struggle" going on between Ofc. Averill and Gay. Showalter Dep. 56:12–16. Lt. Showalter arrived in time to see Gay "trying to pull away from Ofc. Averill and Ofc. Averill trying to hold onto him by, I

believe, an arm, and then . . . basically get him in control and take him to the ground." *Id.* 57:1–4.

Lt. Showalter left his car and proceeded to help Ofc. Averill gain control of Gay's arms, which Gay allegedly was trying to tuck under him to resist handcuffing while "using a lot of vulgarities and being very uncooperative." *Id.* 57:12–59:11. Lt. Showalter said he did not believe he "ever use[d] any type of blows" against Gay, nor did he ever see Ofc. Averill elbow or otherwise strike Gay. *Id.* 58:9–14. However, Lt. Showalter said, it was a "fair struggle" to handcuff Gay, and Lt. Showalter "may probably have put [his] knee . . . into [Gay's] lower back and then, you know, use an arm tactic to pull it out from underneath, so basically getting leverage off of his body, pulling the arm." *Id.* 58:9–60:7. Lt. Showalter said the altercation lasted about 30 seconds, ending with the handcuffing of Gay. *Id.* 60:12–14.

The parties agree that, once handcuffed, the officers stood Gay up and brought him over to a squad car, placing him inside. Before placing him in the squad car, the officers searched Gay's person. Gay Dep. 18–23; Averill Dep. 62:3–4. Lt. Showalter briefly asked some bystanders, who were drawn outside into the cold evening by the police activity, about Gay's identity. One of Gay's neighbors confirmed Gay's claim that he lived there and usually waited in that spot for the bus; another man, walking his dog, said he saw someone, not Gay, fitting the prowler's description in the area of the initial call. Gay Dep. 36:5–9; Showalter Dep. 60:25–62. Lt. Showalter said Gay, who "was very upset," refused to provide his name, and just asserted that he lived there, "interspersed with a lot of profanity." Showalter Dep. 63:19–64; *accord* Averill Dep. 61:7–17.

While Lt. Showalter spoke with Gay's neighbors, Ofc. Averill searched Gay's backpack. Averill Dep. 62:8. Ofc. Averill "at some point" found Gay's wallet, with identification card therein; Ofc. Averill does not recall the wallet's exact location, but Gay claims it was in his pants pocket.

Gay Dep. 35:25; Averill Dep. 62:10–12. Ofc. Averill proceeded to run Gay's information over the radio; the check came back clean. Averill Dep. 63:8–15. During this time, one of Gay's male neighbors approached the squad car, and in response to Ofc. Averill's questioning, verified that Gay lived there. Averill Dep. 64:1–10. Lt. Showalter and Ofc. Averill then conferred, deciding (1) that Gay was not the suspect, and (2) that they would not take Gay in and charge him with resisting arrest or obstructing an investigation, because police resources would be better spent looking for the suspect. They un-cuffed and released Gay from the squad car. *Id.* 65:2–16. The Officers claim that Gay remained highly agitated, and demanded to know their names and to speak with someone in charge; the Officers provided their names and Lt. Showalter said he was the officer in charge. Showalter Dep. 67:23–68:6.; Averill Dep. 65:19–66:12.

According to Gay, he sat in the squad car for approximately 20 minutes before the officers released him. He was upset about the injustice of being held and "beat up," and did some yelling, but "not in a threatening way." Gay Dep. 51:3–52:10. When he was released from the car, Gay said he told the officers to call him an ambulance, but Lt. Showalter refused because Gay was "faking," and told Gay to call for himself. *Id.* 52:12–16. Gay called 911, complained of being beaten by the officers and requested an ambulance, but Lt. Showalter told the dispatcher to disregard the ambulance request. *Id.* 54:1–6; Showalter Dep. 70:21–71:1. "I had absolutely no indication he was hurt," Lt. Showalter claims, as Gay appeared to be calling 911 mostly to complain about his treatment. Showalter Dep. 70:13–73:6. Gay's request for an ambulance occurred one minute and 40 seconds into the approximately one-minute-and-50-second call, and only after the 911 operator specifically asked Gay if he in fact had an emergency and was requesting an ambulance. Defs.' Mot. Summ. J., Ex. G, ECF No. 26-7. Gay acknowledges that he had no major wounds, but claims he did

8

have a few visible scrapes and bruises, and pain in his left shoulder and neck. Moreover, Gay said, it is "pretty obvious" a person will need an ambulance if he "get[s] jumped by two people." Gay Dep. 57:15–58:16.

At this point, Ofc. Averill left the scene to continuing searching for the suspect. Averill Dep. 67:1–68:4. For the next 15 to 20 minutes, Gay and Lt. Showalter talked about the incident, which culminated in Lt. Showalter telling Gay he would call an ambulance for him if he really needed it, Gay recalls. Gay Dep. 56:1–22. Gay, wary because of Lt. Showalter's initial opposition, told Lt. Showalter to leave and Gay would call for help himself. *Id.* 60:22–61:5. Gay called 911 again, was placed through to the hospital, and was told an ambulance was on its way. *Id.* 63:13–64:18. The dispatcher contacted Lt. Showalter, who said he no longer objected to sending the ambulance. Showalter Dep. 71:17–19; Dispatch Audio Clip, ECF No. 26-20.

According to Gay, the ambulance arrived 10 to 15 minutes after Lt. Showalter left and conveyed Gay to Genesis Medical Center, Illini, in Silvis. Gay Dep. 65:10–66:24. Gay said he received an MRI, was placed in an arm sling and given pain relievers, and was told to wear the sling and stay home from work for six days. *Id.* 69:12–70:13. According to emergency room records,[2] the radiologist found no evidence of fracture or dislocation in Gay's left shoulder. Emerg. Room Rec. 3, ECF No. 26-10. The attending physician—noting that Gay had "[n]o other complaints" than pain in his left shoulder and wrist—diagnosed him with an acute contusion on his posterior shoulder and a contusion to his wrist. *Id.* at 4–5. Gay next sought treatment two months later, on April 13, 2012, at ORA Orthopedics PC for constant pain, swelling, weakness, and stiffness in his neck and

---

[2] Plaintiff objects that all evidence submitted by defendants from his medical records is inadmissible. *See, e.g.*, Pl.'s Resp. to Mot. Summ. J. 8. However, medical records are admissible on summary judgment as a hearsay exception under Federal Rule of Evidence 803. *Hughes v. Joliet Correctional Center*, 931 F.2d 425, 428 (7th Cir. 1991).

shoulder. The doctor ordered further MRI testing, which Gay underwent on April 27, 2012, and which identified an overall normal cervical spine but a possible sebaceous cyst. ORA Rec. 1, 4–5, ECF No. 26-14. Gay went for a follow-up at ORA on May 10, 2012, during which the physician noted that Gay still reported some pain but "[o]verall, he is feeling better" and would "consider undergoing chiropractic care and massage therapy." *Id.* at 6. Gay did not end up pursuing these options, and claims that his neck and back felt fully healed about five months after the incident. Gay Dep. 76:18–77:7.

## DISCUSSION

### I.  Standard on Summary Judgment

Summary judgment is the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (internal quotation marks omitted). A court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

At the summary judgment stage the judge's function is not to weigh the evidence and assess the truth of the matter but to determine whether there is a genuine issue for trial—that is, whether there is sufficient evidence favoring the non-moving party for a jury to return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). There can be no genuine issue as to any material fact when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and

on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Further, the court need not credit a party's version of the facts that is blatantly contradicted by the record. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II. Section 1983 Claims

In addition to moving for summary judgment on Counts I–IV, Defendant Officers maintain they are entitled to qualified immunity on these claims.

### A. Legal Framework

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must sufficiently allege that (1) a person acting under color of state law (2) deprived her of a right, privilege, or immunity secured by the Constitution or laws of the United States. *London v. RBS Citizens, N.A.*, 600 F.3d 742, 745–46 (7th Cir. 2010).

The doctrine of qualified immunity "shields government officials against suits arising out of their exercise of discretionary functions 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Jones v. Wilhelm*, 425 F.3d 455, 460 (7th Cir. 2005) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). The doctrine recognizes the harm society would suffer if public officials' performance of their duties was inhibited by "fear of personal monetary liability and harassing litigation." *Anderson*, 483 U.S. at 638.

An official's immunity turns on a two-part inquiry: "first, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right, and second, whether the federal right at issue was clearly established at the time the alleged violation occurred." *Jones v. Clark*, 630 F.3d 677, 680 (7th Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The first question is a matter of law, but the second "requires a broader inquiry." *Gonzalez*

*v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009). Whether a right is clearly established essentially asks "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *See Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Immunity should be recognized where reasonably competent officers could disagree on the issue. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The plaintiff bears the burden of showing that the right was clearly established. *Purtell*, 527 F.3d at 621. The plaintiff can meet this burden by showing "that there is a clearly analogous case establishing a right to be free from the specific conduct at issue" or "that the conduct was so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008) (citations and internal quotation marks omitted). Qualified immunity will be denied at summary judgment if the plaintiff "'present[s] a version of the facts that is supported by the evidence and under which defendants would not be entitled to qualified immunity.'" *See Borello v. Allison*, 446 F.3d 742, 746 (7th Cir. 2006) (quoting *Marshall v. Allen,* 984 F.2d 787, 793 (7th Cir. 1993)).

**B. Analysis**

The inquiry into whether Defendants violated clearly established law often relates to the sufficiency of the evidence supporting the underlying constitutional violation. Therefore, the Court will analyze Defendants' claims for qualified immunity along with their arguments that no genuine issues of material fact exist as to the alleged constitutional violation in each count.

### 1. Count I: False Arrest

Count I alleges that by handcuffing and detaining Gay in the back of the police cruiser without a warrant or probable cause, the officers violated his Fourth Amendment right to be free from unreasonable seizures. Compl. ¶¶ 50–54, ECF No. 1.

### a. Legal Standard

An arrest violates the Fourth Amendment unless the arresting officer has probable cause to detain the individual. *United States v. Askew*, 403 F.3d 496, 506–07 (7th Cir. 2005). Law enforcement officers may utilize brief, investigative stops without probable cause so long as they have "reasonable suspicion that the target has committed, was committing, or was about to commit a crime." *Id.* at 507 (citing *Terry v. Ohio*, 392 U.S. 1, 26 (1968)).

An investigatory stop must be both justified at its inception and "'reasonably related in scope to the circumstances which justified the interference in the first place.'" *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013) (quoting *Terry*, 392 U.S. at 20). An officer may search an individual's person and the area within his control during a Terry stop "if a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Cady v. Sheahan*, 467 F.3d 1057, 1061–62 (7th Cir. 2006) (internal citation and quotation marks omitted).

The line between a lawful *Terry* stop and unlawful arrest is "not bright." *Askew*, 403 F.3d at 507 (citations omitted). "Once police have the reasonable suspicion required to justify an investigatory stop, they may use reasonable means to effectuate that stop." *United States v. Felix-Felix*, 275 F.3d 627, 636 (7th Cir. 2001) (citations omitted). A purported *Terry* stop rises to the level of an arrest, which must be supported by probable cause, if an officer's actions are unreasonable under the circumstances and the facts do not justify a fear for personal safety on the part of the

officer. *United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011) (citing *Jewett v. Anders*, 521 F.3d 818, 824–25 (7th Cir. 2008)). The court "must also consider 'the defendant's own actions in resisting an officer's efforts.'" *Jewett*, 521 F.3d at 825 (citation omitted). Police are permitted to graduate their response to meet the demands of evolving circumstances. *Smith v. Ball State Univ.*, 295 F.3d 763, 770 (7th Cir. 2002).

### b. Analysis

Gay claims the measures taken by the police in seizing and searching him exceeded the scope of a *Terry* stop, transforming the initially valid encounter into a de facto arrest without probable cause. *See* Pl.'s Resp. Mot. Summ. J. 16. Because Gay bears the burden of proving his false arrest claim at trial, he must produce evidence of his alleged Fourth Amendment violation—specifically, that the Officers exceeded the scope of a *Terry* stop and arrested him without probable cause—to survive summary judgment. *See Celotex Corp.*, 477 U.S. at 322. This he has failed to do.

The parties agree that when Ofc. Averill approached Gay, he repeatedly demanded that Gay show him his hands. This was a routine, nonintrusive request to ensure Gay was not holding weapon that could endanger Ofc. Averill or potential bystanders. Gay's testimony as to what he did with his hands in response is inconsistent: he first claims he took them out of his pockets to show Ofc. Averill, but then admits that he can't remember exactly what he did with them. However, Gay acknowledges that, even if he briefly complied, he did not show his hands long enough to satisfy Ofc. Averill's safety concern: "My indication is that he seen my hands clear as day, however my hands were. And there is no reason why he had to keep on saying, 'Show me your hands,' when he seen my hands." Gay Dep. 31:6–9.

What matters is not whether Gay thought he complied with Ofc. Averill's instruction, but whether he objectively did so. Even viewing the evidence in the light most favorable to Gay, there is no escaping the conclusion that Gay did not comply with Ofc. Averill's request sufficient to accomplish its purpose of showing Gay was unarmed. As a result, Ofc. Averill could reasonably believe his safety was at risk, which permitted him to take somewhat more intrusive action to see if Gay was armed without exceeding the scope of *Terry*. *See Cady*, 467 F.3d 1062 (holding protective search of plaintiff and his briefcase was warranted during *Terry* stop where plaintiff "was evasive" in response to officers' questions and repeatedly reached into the briefcase").

Ofc. Averill grabbed Gay's shoulder and commanded him to lie on the ground, a measure that reasonably served the Officer's safety need in light of Gay's behavior. *See Bullock*, 632 F.3d at 1016; *United States v. Tilmon*, 19 F.3d 1221, 1228 (7th Cir. 1994) ("When a suspect is considered dangerous, requiring him to lie on the ground is the safest way for police officers to approach him, handcuff him, and finally determine whether he carries any weapons."). But Gay resisted. Gay claims he "went straight down to the ground." Gay Dep. 32:19–20. The bus video footage, however, shows Gay shift his positioning to stop Ofc. Averill's initial attempt to make him lie down; it is only after a back-and-forth struggle that Ofc. Averill swings Gay to the ground. Because the video "blatantly contradicts" his testimony, and Gay provides no other supporting evidence, the Court does not credit his version of the story. *Scott*, 550 U.S. at 380.

The uncontroverted evidence therefore indicates that Gay was physically resisting Ofc. Averill. At that point, Ofc. Averill could reasonably suspect that Gay intended to fight or flee. Forcibly bringing Gay to the ground, handcuffing him, searching him and his bag, and detaining him until police could verify that he was not the reported prowler were reasonable measures whose

intrusiveness was necessitated by Gay's resistance and safety risk. *See, e.g., Bullock*, 632 F.3d at 1016 (handcuffing, placing in squad car, searching for drugs, and transporting defendant did not exceed scope of *Terry* because police could reasonably believe he was dangerous and a flight risk); *Jewett*, 521 F.3d at 825 (noting officer's justifiable fear for safety and suspect's resistance as factors weighing against finding a de facto arrest)*; United States v. Chaidez*, 919 F.2d 1193, 1198–99 (7th Cir. 1990) (holding that drawing guns, taking defendant's keys and preventing movement, giving *Miranda* warnings, taking defendant to police van to sign consent-to-search form, and detaining defendant for 10 to 15 minutes did not constitute a de facto arrest). Under the circumstances, the Officers' measures did not exceed the bounds of a *Terry* stop.

At the least, the Officers could reasonably believe the law permitted their actions. Seventh Circuit case law permits measures such as physical force, handcuffing, and briefly detaining suspects in a squad car within the acceptable bounds of a *Terry* stop. *See Purell*, 527 F.3d at 621; *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005) (noting the expansion of *Terry* to permit "the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest"). Gay does not point to any case in which, under similar circumstances, these types of police measures were found to be a constitutional violation, nor does Gay argue that the Officers' actions were so excessive as to clearly appear unlawful. *See Chelios*, 520 F.3d at 691. Accordingly, the Officers are entitled to qualified immunity on Gay's false arrest claim.

The Court need not reach Defendants' additional argument that Gay's resistance supplied probable cause to arrest him. Because they are immune, and in the absence of a genuine issue of

material fact as to whether the Officers exceeded the scope of a *Terry* stop, Defendants are granted summary judgment on Count I.

### 2. Count II: Excessive Force

Count II alleges that by forcing Gay to the ground and then elbowing and kicking him, both officers employed excessive force in violation of the Fourth Amendment. Compl. ¶¶ 55–56.

### a. Legal Framework

Determining whether the force used in a seizure was "reasonable" requires "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). The determination focuses on the facts and circumstances of the particular case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

The authority to make an arrest or *Terry* stop necessarily implies the power to accomplish it through "some degree of physical coercion or threat thereof." *Id.* (citing *Terry*, 392 U.S. at 22–27). The test is objective: whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Id.* at 397. Courts consider "the facts as they would have appeared to a reasonable officer on the scene, keeping in mind that an officer often must make a split-second judgment based on rapidly evolving circumstances." *Holmes v. Vill. of Hoffman Estate*s, 511 F.3d 673, 685 (7th Cir. 2007) (citing *Graham*, 490 U.S. at 396–97). The type and severity of a plaintiff's injuries are relevant to whether excessive force was used. *Holmes*, 511 F.3d at 687. Injury is not an essential element of an

excessive force claim, but "no injury gives weight to the assertion of no excessive force." *Meyer v. Robinson*, 992 F.2d 734, 739 (7th Cir. 1993) (internal citation omitted).

### b. Analysis

Gay claims the Officers employed excessive force at two points: (1) when Ofc. Averill took Gay to the ground and (2) when Ofc. Averill allegedly repeatedly elbowed him in the head and Lt. Showalter allegedly kicked him in the side while he was on the ground.

Regarding the takedown, the evidence, even viewed in the light most favorable to Gay, shows that Gay failed to sufficiently comply with Ofc. Averill's show-hands orders and resisted Ofc. Averill's physical efforts to control him. Because Gay posed a safety threat and evasion risk, more coercive measures were warranted than would be appropriate where a suspected prowler cooperates with a police investigation. *See Graham*, 490 U.S. at 396. Ofc. Averill's graduated physical effort to subdue Gay was a reasonable response to the need to control an uncooperative, resisting suspect. The cases Gay relies on—in which officers' tackling of individuals was held excessive—are inapplicable, as they involved detainees who complied with police orders and did not pose safety risks. *See, e.g.,* Pl.'s Resp. to Mot. Summ. J. 13 (citing *Holmes*, 511 F.3d at 687; *Payne v. Pauley*, 337 F.3d 767, 780 (7th Cir. 2003)).

Gay's second theory of excessive force arises from his claims that, while he was prone and partially immobilized, Ofc. Averill repeatedly elbowed him in the head and Lt. Showalter kicked him in the side. Gay never received medical treatment for injuries to his head or torso. His only evidence purporting to show that the Officers struck these blows is his deposition testimony. Further, Gay does not claim to have actually seen the blows inflicted upon him while he was lying face down

underneath Ofc. Averill.  Rather, Gay infers their occurrence based on sensations he claims to have felt.

Even fully crediting Gay's inferences, however, they do not raise a genuine factual issue because they do not materially contradict the Officers' accounts.  Gay claims he did not wilfully resist Ofc. Averill's efforts to handcuff both arms, but he could not make his left arm available because it was injured and immobilized by the fall and Ofc. Averill's subsequent positioning. Regardless of the reason for the difficulty, handcuffing Gay's second arm required some physical maneuvering on Ofc. Averill's part.  Incidental bumping and jostling naturally occurs when an officer struggles to handcuff a person while lying atop him.  Not all physical contact by police is unlawful, only that which is "unreasonable."  *See Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." (internal quotation omitted)).  Gay's failure to complain of or receive medical care for a head injury indicates that any elbowing by Ofc. Averill was performed with relatively little force.   In short, Gay provides insufficient evidence to support any theory other than that the elbowing was accidental, de minimis contact concomitant to the effort to handcuff Gay, and therefore reasonable under the circumstances.

Similarly, Gay surmises from the unseen force he felt that (1) someone kicked him and (2) that person must have been Lt. Showalter due to Ofc. Averill's prone positioning atop Gay.  Again, however, Gay provides no evidence of injury besides the pain he claims to have felt: the medical evidence shows he neither sought nor obtained treatment for an injury to his torso.  Gay's limited evidence is substantially consistent with Lt. Showalter's testimony that he employed a police technique where he placed his knee into Gay's lower back to gain leverage to pull Gay's uncuffed

arm out from underneath his body. Showalter Dep. 60:7–11. The Officers sought to handcuff Gay; whether due to immobility or insubordination, there is no dispute that they were unable to do so while Gay was positioned atop his left arm. The lack of apparent injury indicates that Lt. Showalter did not apply substantial force with his knee. These factors indicate that Lt. Showalter's use of his knee was reasonable. *See Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009) (holding that a knee-to-back police restraint may be reasonable depending on the circumstances, including how much force is applied and to what end).

Gay simply has not provided sufficient factual evidence from which a jury could find excessive force. His only evidence of the alleged kick and elbowing is his claim to have felt the force applied. He provides no direct or circumstantial evidence showing that Ofc. Averill actually elbowed, or Lt. Showalter in fact kicked, him. His scant evidence does not contradict the Officers' accounts, which describe at most incidental contact and limited force applied to achieve a necessary law enforcement purpose of securing a resisting criminal suspect. *See Graham*, 490 U.S. at 396. Even assuming the truth of Gay's evidence, as the Court must, there is no factual dispute as to the actions the Officers took and their reasonableness in light of the circumstances.

Gay correctly notes that the absence of an injury does not prove police did not use excessive force. *See, e.g., Holmes*, 511 F.3d at 687; *Meyer*, 992 F.2d at 739. The Court's determination, however, does not turn on lack of injury. The absence of injury is merely one part of Gay's overall failure to produce sufficient evidence from which a jury could find the Officers took the unreasonably forceful actions Gay alleges.

In addition to the absence of a genuine issue of material fact, Defendants are entitled to summary judgment on Count II on the basis of qualified immunity. The presence of a resisting,

potentially dangerous suspect speaks directly to two of the three factors the Supreme Court has identified as justifying greater use of force. *See Graham*, 490 U.S. at 396. The cases which Gay argues clearly establish the unlawfulness of the Officers' activities, in contrast, involve an unresisting plaintiff. *See* Pl.'s Resp. to Mot. Summ. J. 13. (citing *Holmes*, 511 F.3d at 687; *Payne*, 337 F.3d at 780).

Gay argues that qualified immunity is inappropriate when the facts surrounding the alleged violation are in dispute. *See Borello*, 446 F.3d at 746. But Gay has not provided sufficient evidence to show a genuine factual dispute regarding use of excessive force. *See id.* (noting that plaintiff's account must be "supported by evidence" to defeat qualified immunity). Because reasonable officers could believe the measures employed by Ofc. Averill and Lt. Showalter were within the bounds of lawful force under the circumstances of this case, Defendants are entitled to qualified immunity on this claim. *See Purtell*, 527 F.3d at 621. Accordingly, Defendants are granted summary judgment on Count II.

### 3. Count III: Failure to Intervene

Count III alleges that Lt. Showalter failed to intervene to stop Ofc. Averill's use of excessive force. Compl. ¶¶ 57–59. The Seventh Circuit has held:

> [A]n officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring.

*Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)).

There is no dispute that Lt. Showalter, after receiving Ofc. Averill's call for backup, saw the takedown as he was pulling up to the scene in his squad car. A reasonable jury, however, could not find that Lt. Showalter had reason to know unconstitutional activity was occurring. As explained, Gay fails to provide sufficient evidence that either excessive force was used or an unlawful arrest occurred, and he does not argue that Lt. Showalter witnessed any other type of constitutional violation. Because there is no evidence to support a necessary element of Gay's failure-to-intervene claim, *see Celotex Corp.*, 477 U.S. at 322, Defendants are granted summary judgment on Count III.

### 4. Count IV—Denial of Medical Attention

Count IV alleges that, by cancelling Gay's first request for an ambulance, Lt. Showalter unconstitutionally denied Gay adequate medical care. Compl. ¶¶ 60–65.

### a. Legal Framework

The Fourth Amendment's reasonableness standard governs claims of constitutionally inadequate medical care prior to a detainee's probable cause determination. *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011). To violate the Fourth Amendment, an officer's response to a detainee's medical needs must both be objectively unreasonable and cause the harm of which the plaintiff complains. *Id.* (citation omitted). The objectively-reasonable analysis examines four factors: "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Id.* (citing *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007)).

### b. Analysis

Defendants do not dispute that Lt. Showalter cancelled Gay's first request for an ambulance. However, Gay offers little evidence from which a jury could find that Lt. Showalter had notice of a serious medical need on Gay's part when he did so. *See Williams*, 509 F.3d at 403. According to Gay's testimony, he does not even express interest in medical attention until the Officers, after verifying his identity, un-cuff and release him. At that point, Gay states: "[I] [g]ot out the car, told them that I need them to call me an ambulance." Gay Dep. 52:12–13. In his deposition, Gay said his reason for requesting an ambulance was "[be]cause I was just jumped by two officers. When people get jumped, they have to go to the hospital." *Id.* 54:11–13. Gay never claims that he actually told Lt. Showalter he was in pain or had an injury in need of medical attention.

On Gay's initial 911 call, overheard by Lt. Showalter, Gay did not request an ambulance or mention any medical need until the final 10 seconds of the one-minute-and-50-second call. Defs.' Mot. Summ. J., Ex. G. Gay first described his encounter with police, argued that his rights were violated, and demanded to speak to a commanding officer. *Id.* The 911 operator eventually asked if Gay actually had an emergency, warning him that calling 911 without an emergency is a felony. She then prompted him: "Do you need an ambulance?" Only then did Gay request an ambulance. He never mentioned an injury or other medical condition necessitating the ambulance. *See id.*

As for nonverbal indications of his medical need, Gay claims he had "a couple" scrapes and bruises, but then acknowledges their insignificance, calling them "nothing too major where you couldn't get over it." *See* Gay Dep. 57:22–56:4. At the emergency room, Gay did not complain of or receive treatment for any injuries other than shoulder and wrist pain. Defs.' Mot. Summ. J., Ex. J at 5.

As noted, the Officers did not use excessive force in detaining Gay, foreclosing Gay's strongest argument for the apparency of his medical need—i.e., that an ambulance is obviously necessary for a victim of a police beating. Even viewing the available evidence in Gay's favor, Gay (1) never told Lt. Showalter that he was in pain or had an injury necessitating medical assistance, (2) had no visible injuries significant enough to warrant emergency medical assistance, and (3) requested an ambulance in his 911 call only when prompted by the operator and warned of the ramifications of calling 911 without an emergency to report. Under these facts, it is highly unlikely that a reasonable juror could find that Lt. Showalter was aware of a serious medical need on Gay's part. *See Ortiz*, 656 F.3d at 530. Bolstering Lt. Showalter's judgment is the administrative interest he sought to serve in not diverting limited local emergency response resources to deal with a false alarm. *See id.*

At the least, based on the confluence of these factors, a reasonably competent officer could believe the law permitted him to delay an ambulance request until he could ascertain whether a medical need actually existed. *See Malley*, 475 U.S. at 341. Gay does not carry his burden of establishing the clear unlawfulness of delaying an ambulance under these circumstances, as he neither points to an analogous case nor argues that this denial was so egregious as to be obviously unconstitutional. *See Chelios*, 520 F.3d at 691. Accordingly, Defendant Showalter is entitled to qualified immunity and therefore summary judgment on Count IV.

**B. State Law Claims**

Federal courts exercising supplemental jurisdiction apply state substantive law. *Timmerman v. Modern Indus., Inc.*, 960 F.2d 692, 696 (7th Cir. 1992). Gay brings his claims of battery by the

Officers and vicarious liability by the City of East Moline pursuant to Illinois state law.[3] When all federal claims are dismissed prior to trial, the presumption is that a court should relinquish jurisdiction over supplemental state law claims. *RWJ Mgmt. Co., Inc. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 480 (7th Cir. 2012) (citation omitted). The presumption may be defeated "when it is absolutely clear how the pendent claims can be decided." *Id.* This is such a case.

### 1. Count VI: Battery

Gay claims the Officers battered him during their altercation. Compl. ¶ 70.

### a. Legal Framework

Under Illinois law, a person commits battery "if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a).

The Local Government and Governmental Employees Tort Immunity Act ("Tort Immunity Act"), 745 ILCS 10/1-101 *et seq.*, shields a public employee from liability while enforcing the law unless his or her conduct is "willful and wanton." *Smith v. City of Chicago,* 242 F.3d 737, 744 (7th Cir. 2001) (citing 745 ILCS 10/2-202). "Willful and wanton conduct" means "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210. Whether an officer's actions amount to willful and wanton misconduct is normally reserved for the trier of fact; however, it may be resolved by the court on a motion for summary judgment "when all the evidence viewed in the light most favorable to the nonmovant so

---

[3] Gay has withdrawn Count V, his intentional infliction of emotional distress claim. Pl.'s Resp. Mot. Summ. J. 23. Therefore, it is dismissed pursuant to Federal Rule of Civil Procedure 41(a)(2).

overwhelmingly favors the movant that no contrary determination based on that evidence could ever stand." *Shuttlesworth v. City of Chicago*, 879 N.E.2d 969, 974 (Ill. App. Ct. 2007).

The same primary issue underlies both a Fourth Amendment excessive force claim and a battery claim under Illinois law: whether police use of force was objectively reasonable under the circumstances. *Rebolar ex rel. Rebolar v. City of Chicago*, 897 F. Supp. 2d 723, 741–42 (N.D. Ill. 2012). Therefore, a determination that police conduct was reasonable under the Fourth Amendment necessarily precludes recovery for battery. *Wells v. Coker*, No. 08-cv-3302, 2011 WL 4381488, at *7 (C.D. Ill. Sept. 20, 2011) (citing *Madlock v. City of Peoria*, No. 08-cv-1117, 2010 WL 3853273, at *6 (C.D. Ill. Sept. 28, 2010)), *rev'd on other grounds*, 707 F.3d 756 (7th Cir. 2013); *see also Guidry v. Boyd*, No. 06 C 1600, 2007 WL 2317174, at *15 (N.D. Ill. July 17, 2007) (noting, in granting officers immunity under Tort Immunity Act, that plaintiff "presented no evidence to show that the force or threat of force involved in his arrest was anything more than that which was minimally necessary to place him in secure custody").

### b. Analysis

Gay fails to provide sufficient evidence to show that Ofc. Averill and Lt. Showalter's use of force was unreasonably excessive under the Fourth Amendment. This means he also has failed to provide evidence sufficient to establish that the Officers acted willfully and wantonly. *See, e.g. Wells*, 2011 WL 4381488, at *7. Because there is thus insufficient evidence from which any reasonable jury could find that the Officers battered Gay, Defendants are granted summary judgment on Count VI. *See Shuttlesworth*, 879 N.E.2d at 974.

26

### 2. Counts VII and VIII: Vicarious Liability and Indemnification

Count VII seeks to hold the City of East Moline vicariously liable for the Officers' alleged commission of battery within the scope of their employment. Compl. ¶¶ 71–72. Count VIII maintains that the City must indemnify the officers for any compensatory damages assessed against them in this case. *Id.* ¶¶ 73–74. Under the Tort Immunity Act, "[a] local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages . . . for which it or an employee while acting within the scope of his employment is liable in the manner provided in this Article." 745 ILCS 10/9-102. However, the public entity is not liable where the employee is not liable. 745 ILCS 10/2-109. Because all of Gay's claims against the Officers have been dismissed, there is no liability for the City to vicariously share in or indemnify. Defendants are granted summary judgment on Counts VII and VIII.

### CONCLUSION

Defendants' Motion for Summary Judgment, ECF No. 26, is GRANTED. All claims in the Amended Complaint, ECF No. 6, are DISMISSED. The Clerk is directed to enter judgment and close the case.

Entered this 27th day of June, 2014.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE
